[Cite as *Dayton City School Dist. Bd. of Edn. v. Dayton Edn. Assn.*, 2018-Ohio-4350.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| DAYTON CITY SCHOOL DISTRICT BOARD OF EDUCATION | : | |
| | : | |
| | : | Appellate Case No. 27793 |
| Plaintiff-Appellant | : | |
| | : | Trial Court Case No. 2017-CV-2292 |
| v. | : | |
| | : | (Civil Appeal from |
| DAYTON EDUCATION ASSOCIATION, et al. | : | Common Pleas Court) |
| | : | |
| Defendants-Appellees | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 26th day of October, 2018.

. . . . . . . . . .

BRIAN L. WILDERMUTH, Atty. Reg. No. 0066303 and LAUREN K. EPPERLEY, Atty. Reg. No. 0082924, 50 Chestnut Street, Suite 230, Dayton, Ohio 45440
    Attorneys for Plaintiff-Appellant

SUSAN D. JANSEN, Atty. Reg. No. 0089205, 111 West First Street, Suite 1100, Dayton, Ohio 45402
    Attorney for Defendants-Appellees

. . . . . . . . . . . .

WELBAUM, P.J.

**{¶ 1}** This case is before us on the appeal of Plaintiff-Appellant, Dayton City School District Board of Education ("Board") from a judgment affirming an arbitration award in favor of Defendants-Appellees, Dayton Education Association ("DEA"), and several Dayton Public School employees. The Board contends that the trial court erred in refusing to vacate the arbitration award because the award was not rationally derived from the terms of the collective bargaining agreement.

**{¶ 2}** We conclude that the trial court did not err in concluding that the arbitration award had a rational connection to the collective bargaining agreement and was not arbitrary, capricious, or unlawful. Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

**{¶ 3}** The issues in this case involve a collective bargaining agreement (the Master Contract) between the Board and the DEA that was effective from December 21, 2013, through June 30, 2017. The DEA is a union representing just over 1,000 professional staff members; in total, the Dayton Public School District ("DPS") has more than 2,000 employees.

**{¶ 4}** Among other provisions, the Master Contract includes Article 49, which is titled "Insurance." Article 49 contains various subsections pertaining to medical and dental enrollment, medical and dental benefits, life insurance benefits, premium payments, flexible spending accounts, and so on.

**{¶ 5}** DPS has a self-funded insurance plan. Under the 2013-2017 contract, the

parties switched from a preferred provider organization plan to a high deductible plan that included health savings accounts. DPS was a client of McGohan Brabender ("McGohan"), which consults with clients about various issues, including compliance and healthcare. Carrie Thornton, a McGohan account manager, was in charge of the DPS account and assisted DPS in transitioning to the high deductible plan. As part of the transition, McGohan representatives held hundreds of meetings with DPS employees to educate them about the plan.

{¶ 6} McGohan also worked with DPS senior personnel on strategic plans and recommended that DPS implement a dependent verification audit. Before the process began, McGohan reviewed different companies able to assist with such an audit and recommended ConSova, an out-of-state company. McGohan had previously worked with ConSova in many different situations involving its largest clients and was very comfortable with ConSova's documentation and resources for implementing the recommended audit. According to Thornton, McGohan particularly liked ConSova's assumption that employees were doing the right thing and that ConSova would work with employees on providing correct documentation.

{¶ 7} Prior to the audit, Thornton was involved in multiple conference calls with ConSova and DPS leadership. To select the documentation required for the audit, ConSova followed the guidelines for Section 125 of the Internal Revenue Code, which is the tax-free vehicle that allows employees to pay for insurance premiums on a pre-tax basis. The audit documentation itself was tailored to each type of dependent. For example, the documentation needed for a child would be different from what was required for a domestic partner, and so forth.

{¶ 8} During the conference calls, DPS leadership, Thornton, and ConSova discussed documentation that ConSova had recommended, as well as the reasons why DPS should use particular types of documents for verification. For example, ConSova recommended using marriage certificates rather than marriage licenses for verifying spouses, because marriage licenses are issued before marriage, with no guarantee that a marriage will actually occur; in contrast, marriage certificates are issued after marriage and verify that a marriage has taken place. After consulting with ConSova and Thornton, DPS used the documentation that ConSova had recommended.

{¶ 9} During the planning process, Thornton and DPS met with union leaders, including David Romick, the DEA president, and discussed the Board's intentions with respect to the audit. They also discussed the need for employees to affirmatively respond to the audit and what the consequences would be for dependents of employees who failed to affirmatively respond. The unions, including DEA, were told that if employees failed to respond or failed to respond correctly, their dependents would be removed retroactively from the plan before inception of the new insurance plan, which was scheduled to start on January 1, 2016. The audit, itself, had two phases, and Thornton and DPS met again with the union leaders after the close of the first phase of the audit.

{¶ 10} The audit began in September 2015, prior to open enrollment for the next year's health plan. Open enrollment took place in November 2015, and, as was noted, the next plan year was to begin on January 1, 2016.

{¶ 11} The first phase of the audit applied to all DPS employees with dependents enrolled in the current health plan. Anyone who had a currently-enrolled dependent was

required to go through the audit process.

{¶ 12} After the audit began, people might either have life-changing events (like the birth of a child or a marriage) in connection with the current plan, or might enroll dependents for the next year's plan. This was the second phase of the audit. If employees had provided dependent verification during the previous phase, they would not be required to do so again. However, if employees added new dependents to the plan, they would need to go through the audit process and provide the required documentation.

{¶ 13} DEA president David Romick testified at the arbitration hearing. Romick recalled attending a meeting that included the presidents of the 14 DPS bargaining units, the DPS superintendent, and the DPS treasurer. This was a regularly scheduled meeting and was held before the DPS treasurer sent an email to all employees notifying them of the upcoming audit. The email was sent on September 3, 2015.

{¶ 14} At the meeting, the union presidents were told that DPS would be conducting a dependent audit using an outside agency. DEA did not object to the audit; in fact, Romick testified that DEA absolutely supported the audit because of cost savings for the district and for members in terms of what they would pay for their policies.

{¶ 15} Phase one of the verification process lasted from September 21 to October 25, 2015, and phase two took place between October 26, 2015, and November 22, 2015. An appeals phase, during which employees could appeal to ConSova after receiving a "drop letter," lasted from November 23, 2015 to January 11, 2016. In reality, this "appeals" phase simply offered employees a further opportunity to submit documentation without having their dependents removed from the plan.

{¶ 16} On September 3, 2015, the DPS treasurer, Craig Jones, sent an email to all DPS employees, notifying them about the dependent verification audit that was going to take place. Jones told employees that they would soon receive a mailing from ConSova at their addresses, and he also attached a flyer to the email. The email stressed that: "You must take action immediately upon receipt of the letter. If you do not take action your dependent(s) benefits may be cancelled. To cover eligible dependents, a response is mandatory." Board Ex. J-175.

{¶ 17} A "robo" call was then made to all DPS employees on September 18, 2015, reminding them that they would soon be receiving mail from ConSova about the upcoming verification and must take action immediately to cover eligible dependents.

{¶ 18} On September 23, 2015, DPS sent a letter to all employees. The letter was addressed individually to each employee at his or her address, explained the audit process in detail, and notified employees that the deadline for submitting documentation was October 19, 2015. Employees were again informed that this was not a "passive" process and that non-response would result in termination of coverage for dependents. *See, e.g.*, DEA Ex. I-1. The letter included a "frequently asked questions" page as well as a letter from ConSova dated September 23, 2015. The ConSova letter listed the dependents that the particular employee was required to verify, again reiterated that the verification process was not passive, and stressed that "[n]on-response or incomplete documentation will result in the termination of coverage for these dependents." *Id*. at I-3.

{¶ 19} ConSova's letter also included a separate sheet listing the specific dependent documentation that was required. For example, to verify either a "natural" or

a legally adopted child, employees were required to submit a "State or county issued birth certificate showing employee's name or signed court order." *Id.* at I-4. The October 19, 2015 deadline for submitting documentation was again stressed.

**{¶ 20}** When DEA learned that failure to respond would result in termination of dependent benefits, it sent members an email like the treasurer's email, indicating that if members were contacted by ConSova, the contract was legitimate and not a scam. DEA also encouraged members to attend enrollment meetings and healthcare meetings that EBC[1] and McGohan were sponsoring, so that employees could educate themselves. In addition, DEA sent its members other several emails, beginning shortly after the treasurer's September 3, 2015 email and continuing into October 2015. DEA additionally assisted members on a case-by-case basis. According to Romick, DEA probably addressed hundreds of questions daily.

**{¶ 21}** In October 2015, ConSova sent letters to employees indicating whether or not their documentation was complete. If complete, no further action was needed; if not, ConSova indicated how the documentation was incomplete or missing and what was needed to comply. *See, e.g.*, Board Ex. J-209 (October 8, 2015 letter to DPS employee Sara Cooley). These letters again stressed the consequences of non-compliance and stated that documentation must be submitted no later than November 16, 2015. ConSova also provided the telephone number of its Dependent Eligibility Verification Center, so that employees could receive assistance. *Id.*

**{¶ 22}** In October 2015, the Board provided DEA and all other DPS bargaining

---

[1] EBC (Enrollment Benefits Concept) is a third-party contractor that handles insurance enrollment for DPS.

units with a list of members in their units who had not complied with the audit. Romick divided DEA's list based on buildings, because DEA had members in 30 different buildings. Romick then gave a list to the representative for each building and asked the representatives to encourage members on their lists to do what was needed. Subsequently, DEA followed up with building representatives "to make sure that they were contacting that list of members in their building, having a face-to-face, and urging them to comply with the audit." Board Ex. G-79 (p. 431 of the arbitration transcript).

{¶ 23} On November 6, 2015, DPS sent another email to all employees and attached a sample "disposition" letter. The email noted that reminder calls had been made that week to all incomplete and non-responder status employees. In addition, the email stressed the November 16, 2015 post-mark deadline for submission of documentation.[2]

{¶ 24} The email further informed employees of the current audit status. Specifically, 75% of employees had responded, 100 verifications (involving 124 dependents) were incomplete, and 240 employees (involving 514 dependents) had not yet responded. The email went on to state that:

> Our goal is to ensure eligible dependents are properly covered. If you have not received a Disposition Letter (sample attached), which confirms "Documents complete" for all eligible dependents you should immediately contact ConSova at 866-529-9105. Non-response or incomplete documentation will result in the termination of coverage for the dependents.

---

[2] Employees could also upload documents through the ConSova website.

Board Ex. J-176. Due to DPS's internal email process, DPS was able to tell if employees had read the email. DPS could also tell the date and time when emails were read.

{¶ 25} In November 2015, open enrollment occurred for coverage that was to begin on January 1, 2016. As Thornton indicated, during open enrollment, employees who were enrolling new dependents in the plan were required to provide verification; if the required documents had already been provided for dependents who were being re-enrolled (as opposed to being new enrollees), employees would not be required to resubmit documents.

{¶ 26} In early December 2015, ConSova sent a further letter to DPS employees notifying them that, as of November 23, 2015, ConSova had not received requested information to verify eligibility for their listed dependents. The letter stated that if the information were not received, coverage for the dependents would be terminated effective December 31, 2015. The letter indicated that to avoid removal of dependents, employees could send eligibility documentation to ConSova by uploading the documents at ConSova's website or by mailing them with a postmark dated on or before January 4, 2016. Finally, the letter again included the list of needed documentation and provided a phone number for contacting ConSova's dependent assistance center. *See, e.g.*, Board Exs. J-212; J-228. This was characterized by ConSova as an "appeals" process, but it was actually a final opportunity to submit required documentation.

{¶ 27} Subsequently, in early to mid-January 2016, ConSova notified employees whether their "appeal" had been approved and whether their dependents would stay on the DPS health plan. *See, e.g.*, Board Ex. J-298 (January 12, 2016 letter from ConSova to Michelle Jackson, indicating that ConSova had approved her "appeal" for one

dependent, but had denied her "appeal" for the other dependent because of missing documentation for that dependent); Board Ex. J-338 (January 6, 2016 letter denying "appeal" of Mary Roos).[3]

{¶ 28} On or around January 27, 2016, the Board sent letters to the employees who had not responded or who had provided incomplete documentation as of January 4, 2016. The letters indicated that coverage for the employees' enrolled dependents had terminated effective December 31, 2015, that the dependents would not be eligible for COBRA, and that the next available opportunity for eligible dependents to be enrolled would be during DPS's next open enrollment in November 2016 for the plan year that would be effective on January 1, 2017. In addition, the Board enclosed information about an alternate health plan called NextPlan IQ, and indicated that those who lost coverage would have a special enrollment period for that plan ending on February 29, 2016. *See, e.g.*, Board Exs. J-231 and J-232.

{¶ 29} After learning of the termination of coverage, some employees contacted Pam Calvert, the DPS benefits coordinator. These were not considered appeals, but were treated as requests for an exception due to circumstances like an employee's failure to receive letters from ConSova. Calvert's role was to confirm what ConSova had received, and to then forward the information to her supervisor, Judith Spurlock, and to the DPS treasurer. Ultimately, very few exceptions were made. According to Thornton (the DPS account manager at McGohan), an exception was made for an individual whose

---

[3] Based on the evidence submitted, this "appeals" letter would have been sent only to employees who actually submitted additional documentation after the November 16, 2015 deadline or the December 7, 2015 letter. Some employees did not submit any additional documents to ConSova between November 16, 2015, and January 4, 2016.

marriage license arrived at the close of the audit, and there was not sufficient time to respond and tell her that a marriage certificate was needed.

{¶ 30} On February 11, 2016, DEA filed a "class action" Level II grievance, which stated that:

Since on or about January 27, 2016[,] and continuing[,] the Dayton City School District violated Article 49 of the contract between the DEA and the School Board when it failed and refused to provide dependent coverage to the grievants' eligible dependents.[4]

{¶ 31} A grievance hearing was held on April 7, 2016, during which only one employee (Jennifer Evans) testified. On April 14, 2016, the hearing officer denied DEA's grievance, concluding that DEA failed to prove a contractual violation. DEA then demanded arbitration, and the matter was heard by an arbitrator on October 24 and 25, 2016. At the hearing, DEA presented testimony from David Romick and from seven DEA members whose coverage for a dependent or dependents had been terminated. The Board presented testimony from Pam Calvert and Carrie Thornton.

{¶ 32} After the hearing, the arbitrator issued a decision on February 13, 2017, concluding that DEA's grievance was timely. The arbitrator also found that, while the Board had the right to verify dependent coverage, there were issues concerning whether it was reasonable to require only the specified documents for verification. In addressing the individual cases, the arbitrator concluded that six of the seven had merit.

---

[4] The actual grievance is not in the record. However, DEA did not indicate at the trial level or on appeal that this statement of the grievance was incorrect. The grievance decision is in the record and indicates essentially the same content concerning the grievance that DEA filed. *See* Board Exs.C-22 and C-23; Doc. #14, Board Exs. H-154 and H-155.

Accordingly, the arbitrator retained jurisdiction to resolve disputes about any claimed damages.

{¶ 33} On May 12, 2017, the Board filed a motion in the trial court, seeking to vacate the arbitration opinion and award. In its motion, the Board contended that DEA's grievance was untimely and that the audit was a management right not subject to arbitration. DEA responded and asked the court to affirm the arbitration award. After the record was filed, the trial court issued a decision on October 10, 2017, confirming the arbitration decision. The Board then timely appealed from the trial court's decision.

## II. Alleged Error in Confirming the Award

{¶ 34} The Board's sole assignment of error states that:

The Trial Court Erred When It Confirmed and Refused to Vacate an Arbitration Award That Was Not Rationally Derived from the Terms of a Collective Bargaining Agreement.

{¶ 35} Under this assignment of error, the Board contends that the trial court erred by failing to vacate the award because the arbitrator exceeded his authority under the collective bargaining agreement (the Master Contract). According to the Board, the dependent audit was a management right that was not subject to arbitration. The Board notes the arbitrator's conclusion that the right to conduct the audit was a management right and argues that the arbitrator should have concluded his analysis at that point. However, according to the Board, instead of focusing on the management rights clause of the contract (Article 67.06) and the contract's preamble, the arbitrator incorrectly relied on Article 49 as a basis for jurisdiction. The Board contends that there is no rational

nexus between Article 49 and the dependent audit.

### A. Standards for Review of Arbitration Awards

{¶ 36} Under R.C. 2711.13, any party may file a motion in the common pleas court to vacate an award that has been made in an arbitration proceeding. R.C. 2711.09 also allows parties to file motions in the common pleas court for orders confirming arbitration awards. In either situation, the common pleas court is required to grant the order to confirm unless the court vacates, modifies, or corrects the award under R.C. 2711.10 or R.C. 2711.11.

{¶ 37} R.C. 2711.10 is the pertinent provision here, and states, in relevant part, that:

> In any of the following cases, the court of common pleas shall make an order vacating the award upon the application of any party to the arbitration if:
>
> * * *
>
> (D) The arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

{¶ 38} Recently, the Supreme Court of Ohio settled a conflict between districts concerning the appropriate standard for reviewing trial court decisions on arbitration awards. The court rejected an abuse of discretion standard, and held, as a matter of first impression, that:

> When reviewing a decision of a common pleas court confirming, modifying,

vacating, or correcting an arbitration award, an appellate court should accept findings of fact that are not clearly erroneous but decide questions of law de novo.

*Portage Cty. Bd. of Dev. Disabilities v. Portage Cty. Educators' Assn. for Dev. Disabilities*, 153 Ohio St.3d 219, 2018-Ohio-1590, 103 N.E.3d 804, syllabus. This is the standard we have previously used. *See, e.g., Kettering Health Network v. CareSource*, 2d Dist. Montgomery No. 27233, 2017-Ohio-1193, ¶ 11.

{¶ 39} Under public policy favoring arbitration, "courts have only limited authority to vacate an arbitrator's award." *Assn. of Cleveland Fire Fighters, Local 93 of the Internatl. Assn. of Fire Fighters v. Cleveland*, 99 Ohio St.3d 476, 2003-Ohio-4278, 793 N.E.2d 484, ¶ 13. Reviewing courts are restricted to deciding "whether the award draws its essence from the CBA and whether the award is unlawful, arbitrary, or capricious." *Id.*, citing *Findlay City School Dist. Bd. of Edn. v. Findlay Edn. Assn.*, 49 Ohio St.3d 129, 551 N.E.2d 186 (1990), paragraph two of the syllabus. As a result, "if there is a rational nexus between the contract and the arbitrator's award and the award is not arbitrary, capricious or unlawful, the arbitrator did not exceed her authority and the award cannot be vacated pursuant to R.C. 2711.10(D)." *Montgomery Cty. Sheriff v. Fraternal Order of Police*, 158 Ohio App.3d 484, 2004-Ohio-4931, 817 N.E.2d 107, ¶ 22 (2d Dist.).

{¶ 40} "An arbitrator's award departs from the essence of a collective bargaining agreement when: (1) the award conflicts with the express terms of the agreement, and/or (2) the award is without rational support or cannot be rationally derived from the terms of the agreement." *Ohio Office of Collective Bargaining v. Ohio Civ. Serv. Employees Assn., Local 11, AFSCME, AFL-CIO*, 59 Ohio St.3d 177, 572 N.E.2d 71 (1991), syllabus.

*Accord Piqua v. Fraternal Order of Police*, 185 Ohio App.3d 496, 2009-Ohio-6591, 924 N.E.2d 876, ¶ 24 (2d Dist.); *Ohio Patrolmen's Benevolent Assn. v. Findlay*, 149 Ohio St.3d 718, 2017-Ohio-2804, 77 N.E.3d 969, ¶ 16.

{¶ 41} Further, "an arbitrator may not create a contract of his own by imposing additional requirements not expressly provided for in the agreement." *Internatl. Assn. of Firefighters, Local 67 v. Columbus*, 95 Ohio St.3d 101, 104, 766 N.E.2d 139 (2002), citing *Ohio Office of Collective Bargaining* at 183.

{¶ 42} In *Portage Cty. Bd. of Dev. Disabilities*, the Supreme Court of Ohio also stated that " '[t]he question whether an arbitrator has exceeded his authority is a question of law * * *.' " *Portage Cty. Bd. of Dev. Disabilities*, 153 Ohio St.3d 219, 2018-Ohio-1590, 103 N.E.3d 804, at ¶ 25, quoting *Green v. Ameritech Corp.*, 200 F.3d 967, 974 (6th Cir.2000). Since this is a question of law, we accord no deference to the trial court's decision, but decide the issue de novo.

{¶ 43} Before we consider whether the arbitrator exceeded his authority, we note that the Board has mentioned in passing in its brief that DEA's grievance was untimely. *See* Appellant's Brief, p. 5. However, the Board has not assigned error to this point, nor has the Board specifically discussed the matter in its brief, as required by App.R. 16(A)(3) and (7). Under App.R. 12(A)(1)(b), we decide an "appeal on its merits on the assignments of error set forth in the briefs under App.R. 16, the record on appeal under App.R. 9, and, unless waived, the oral argument under App.R. 21." "We 'sustain or overrule only assignments of error and not mere arguments.' " *Dunina v. Stemple*, 2d Dist. Miami No. 2007 CA 9, 2007-Ohio-4719, ¶ 4, quoting *State v. Fed. Ins. Co.*, 10th Dist. Franklin No. 04AP-1350, 2005-Ohio-6807, ¶ 7. *See also Kidd v. Alfano*, 2016-Ohio-

7519, 64 N.E.3d 1052, ¶ 52 (2d Dist.); *Discover Bank v. Heinz*, 10th Dist. Franklin No. 08AP-1001, 2009-Ohio-2850, ¶ 13 (courts may disregard errors not separately assigned or argued). In view of our discretion to disregard error that is not separately assigned, we will not consider any alleged untimeliness of the grievance that DEA filed. We can consider error in the interests of justice, but decline to do so, since the Board chose not to elaborate on its assertion that the grievance was untimely.

### B. Management Rights

{¶ 44} As was noted, on February 11, 2016, DEA filed its "class-action" grievance, asserting the following ground:

Since on or about January 27, 2016[,] and continuing[,] the Dayton City School District violated Article 49 of the contract between the DEA and the School Board when it failed and refused to provide dependent coverage to the grievants' eligible dependents.

{¶ 45} At the initial grievance hearing, which was held on April 7, 2016, DEA's asserted position was that the Board had improperly conducted a dependent audit. Regarding this contention, the grievance hearing officer stated that:

DEA asserts that the terms for open enrollment, the types of available coverage, and the requirements for new hires to obtain insurance are all contained in Article 49 of DEA's CBA. DEA asserts that there is no language concerning a dependent audit or conditions for maintaining family coverage in the DEA's CBA. DEA asserts that if Administration wanted to conduct a dependent audit or to impose conditions for maintaining family

coverage, then it should have negotiated those things into the DEA CBA. DEA asserts that since this audit was not negotiated between the parties, it violates DEA's CBA.

Board Ex. C-22.   As was noted, the hearing officer rejected DEA's grievance.

**{¶ 46}** In his decision, the arbitrator acknowledged that conducting verification of coverage through an audit was a reasonable exercise of contractual management rights in the contract.   Specifically, the arbitrator stated that:

* * * This management right is governed somewhat by Article 49 that requires insurance forms to be filed in a timely manner by new staff members.   Failure to file the forms "will result in coverage being delayed until the first day of the month after they are received."   While this language applies to new hires, it implies that forms are to be filed by both new and existing employees in a timely manner.

I find that management was acting within its broad management authority to verify the existing status of claimed dependents (and spouses) by instituting an audit.   But like all other management rights, they are not absolute even if not specifically limited by CBA language.   For example, unilaterally imposed changes in work rules, disciplinary rules or material changes in working conditions must be reasonable on their face, and they must be applied in a reasonable manner.   They can be challenged if they are arbitrary, capricious, illegal, unconscionable, or clearly unreasonable. The audit procedures and requirements are not unreasonable on their face. Sufficient time was provided for compliance with the required submissions.

It was not unreasonable for ConSova to request the specific documents it wanted to use for verification. There is an issue, however, as to whether it was reasonable to require only the specified documents on an exclusive basis for verification when the failure to meet the specifications resulted in a total loss of coverage.

I find that the Board provided sufficient time to comply with the audit requests and that its notice attempts were reasonable, as shown by the high compliance rates. Again, however, the question must be asked as to whether the coverage removal penalty for delay in responding and complying in each case was unreasonably excessive.

Board Exs. M-14 and 15.

{¶ 47} Ultimately, the arbitrator found that removal of coverage for the dependents of six of the seven individual employees was arbitrary and unreasonable. In reviewing the arbitrator's decision, the trial court concluded that a rational nexus existed between the contract and the award because the arbitrator was "applying the Board's obligation to provide the [health insurance] benefits, limited only by reasonable limitations and conditions." Doc. #17, Decision and Entry Confirming Arbitration Decision, p. 3.

{¶ 48} As was indicated, the Board argues that the verification audit fell within the exercise of management rights, which were preserved under the Master Contract and are not subject to arbitration. The preamble of the Master Contract states that:

B. Except to the extent specifically modified by the terms of this CONTRACT, the Dayton Board of Education (hereinafter referred to as BOARD) has all powers, rights, and reserve duties conferred it under the

provisions of the Revised Code of Ohio.

Board Ex. H-5.

{¶ 49} Article 67, Section 67.06, further provides as follows:

> 67.06   Management's Rights
>
> All rights and powers heretofore possessed by the BOARD, except as otherwise specifically modified by the express provisions of this CONTRACT, shall be retained solely and exclusively by the BOARD.

Board Ex. H-143.

{¶ 50} In this regard, the Board notes that under R.C. 4117.08, it has various statutory rights, including the right to decide matters of inherent managerial authority, which encompasses maintaining and improving the effectiveness and efficiency of governmental operations and deciding overall methods of conducting governmental operations.   Therefore, according to the Board, nothing in the Master Contract modified or removed these rights, and the Board should be allowed to conduct an audit "without being second-guessed by an arbitrator."   Appellant's Brief at p. 16.

{¶ 51} R.C. 4117.08(A) provides that:

> All matters pertaining to wages, hours, or terms and other conditions of employment and the continuation, modification, or deletion of an existing provision of a collective bargaining agreement are subject to collective bargaining between the public employer and the exclusive representative, except as otherwise specified in this section and division (E) of section 4117.03 of the Revised Code.[5]

---

[5]  R.C. 4117.03 sets forth the rights of public employees, and states in subsection (E) that

**{¶ 52}** As pertinent here, R.C. 4117.08(C) further provides that:

Unless a public employer agrees otherwise in a collective bargaining agreement, nothing in Chapter 4117 of the Revised Code impairs the right and responsibility of each public employer to:

(1) Determine matters of inherent managerial policy which include, but are not limited to areas of discretion or policy such as the functions and programs of the public employer, standards of services, its overall budget, utilization of technology, and organizational structure;

* * *

(3) Maintain and improve the efficiency and effectiveness of governmental operations;

* * *

The employer is not required to bargain on subjects reserved to the management and direction of the governmental unit except as affect wages, hours, terms and conditions of employment, and the continuation, modification, or deletion of an existing provision of a collective bargaining agreement. A public employee or exclusive representative may raise a legitimate complaint or file a grievance based on the collective bargaining agreement.

**{¶ 53}** The arbitrator and the DEA relied on Article 49 of the contract, which deals with "Insurance." Section 49.01 provides that:

A Medical Insurance Program shall be available in accordance with

---

"[e]mployees of public schools may bargain collectively for health care benefits."

the provisions of this article for all Professional Staff Members covered by this CONTRACT who complete the required applications for insurance and transmit such applications to the Treasurer of the BOARD during the required enrollment period.   Insurance coverage is not automatic.

Appropriate information and application forms will be provided to all new Professional Staff Members at the time of employment.   If the date of employment is later than the open enrollment period, required insurance forms shall be filed with the office of the Treasurer within five (5) work days of receipt.   Forms that are not returned in five (5) work days will result in coverage being delayed until the first day of the month after they are received.   This penalty for delay will be clearly noted to the new employee. Forms not filed within thirty (30) days of commencement of employment coverage will not be available until the next enrollment period.

Board Exs. H-93 and H-94.

{¶ 54} DEA contends that the arbitrator's decision did not exceed his authority because he was interpreting the agreement.   According to the DEA, in addition to the above provisions relating to penalties for delay in filing forms, Article 49 contains an agreement for provision of health insurance coverage, which includes the Board's payment of 85% of premiums as well as financial contributions toward the health savings accounts of employees with single or family coverage.   DEA also points out that in Section 67.02.1 of the contract, the Board agreed that "it will not, during the period of this CONTRACT, officially adopt or implement any condition of employment affecting Professional Staff Members that is not contained within this CONTRACT until such term

or condition has been a subject of negotiations between the parties."   Board Ex. H-142. DEA, consequently, contends that the Board could not properly take action removing dependents from an employee's health care coverage when this condition had not been negotiated.

{¶ 55} While the issue of a dependent verification is not specifically addressed in the contract, R.C. 4117.08(A) refers broadly to the fact that "[a]ll matters pertaining to wages, hours, or terms and other conditions of employment" are subject to negotiation. Furthermore, although R.C. 4117.08(C) does exempt employers from bargaining "on subjects reserved to the management and direction of the governmental unit," that right is qualified by exceptions, i.e., the exemption from bargaining does not extend to subjects that "affect wages, hours, terms and conditions of employment, and the continuation, modification, or deletion of an existing provision of a collective bargaining agreement."

{¶ 56} The Supreme Court of Ohio has said that "[t]he word 'affect' in R.C. 4117.08(C) suggests that management rights which 'act upon' or 'produce a material influence upon' working conditions are bargainable. * * * Thus, a reasonable interpretation of R.C. 4117.08(C) is that where the exercise of a management right causes a change in or 'affects' working conditions or terms of a contract, then the decision to exercise that right is a mandatory subject for bargaining."   *Lorain City School Dist. Bd. of Educ. v. State Emp. Relations Bd.*, 40 Ohio St.3d 257, 262, 533 N.E.2d 264 (1988).

{¶ 57} We have found very little case law relating to dependent verification, as most of the employer/employee disputes center on disciplinary measures taken against employees or other individual personnel issues.   *See, e.g., Fraternal Order of Police,* 185 Ohio App.3d 496, 2009-Ohio-6591, 924 N.E.2d 876, at ¶ 1 (discipline); *Dayton v. Internatl.*

*Assn. of Firefighters, Local 136*, 2d Dist. Montgomery No. 27600, 2018-Ohio-2746, ¶ 16 (overtime); *Dayton v. Fraternal Order of Police*, 2d Dist. Montgomery No. 20863, 2006-Ohio-1129, ¶ 5 (transfers of officers to different districts).

{¶ 58} However, in *Dayton v. Fraternal Order of Police*, 76 Ohio App.3d 591, 602 N.E.2d 743 (2d Dist.1991), we considered whether the trial court had properly vacated an arbitration decision concerning the City of Dayton's payment of health insurance benefits for members of the police union. *Id.* at 593. The dispute in that case involved the amount of "cap" that would be applied to the city's share of insurance premiums and the date when the new cap would be effective. *Id.* at 595. While the contract in that case did provide for re-opening of health care coverage negotiations, of note are two observations we made: (1) that "the contracts evidence a mutual intention that throughout each three-year period the city will provide health care coverage to appellant's members"; and (2) that "the issue to be determined does not concern a matter of 'management rights' but, instead, an employee benefit." *Id.* at 599.

{¶ 59} We also noted in *Internatl. Assn. of Firefighters, Local 136* (an overtime case), that the collective bargaining agreement did not "address the precise issue presented to the arbitrator, making an interpretation necessary", and that "[s]ince a contractual interpretation was required, the arbitrator, whether the decision is correct or not, did not exceed his authority." *Internatl. Assn. of Firefighters, Local 136* at ¶ 16.

{¶ 60} Moreover, the Fourth District Court of Appeals has stated that "[s]ince payment for sick leave affects wages and terms and conditions of employment, it was required to be bargained for, and the reservation of management rights in R.C. 4117.08(C), which the [employer] retained, does not include the right to impose additional

sick leave requirements not included in the collectively bargained provision." *Deeds v. City of Ironton*, 48 Ohio App.3d 7, 11, 548 N.E.2d 254 (4th Dist.1988).[6]

**{¶ 61}** Our research has disclosed one out-of-state case that involves a fact situation similar to the case before us. In *City of San Antonio v. Internatl. Assn. of Fire Fighters, Local 624*, Tex. App. Nos. 04-12-00783-CV, 04-13-00109-CV, 2013 WL 5508408 (Oct. 2, 2013), a firefighter's union brought suit against the city of San Antonio. The union contended that the city had violated provisions of the local government code related to collective bargaining by: (1) unilaterally requiring firefighters to be actively enrolled to receive health-care benefits; and (2) "threatening termination of coverage for currently covered dependents unless the firefighters provide additional information." *Id.* at *1.

**{¶ 62}** In response to the suit, the city filed a motion to abate the case for arbitration, arguing that the lawsuit concerned application or interpretation of the collective bargaining agreement. *Id.* After the trial court denied the city's motion, the city appealed. The city also filed a petition for a writ of mandamus in the court of appeals, seeking to compel the union to engage in arbitration, as mandamus was the appropriate common law remedy in that situation. *Id.* at *2. The court of appeals denied the petition for writ of mandamus, finding that the Federal Arbitration Act, rather than the common law, applied. *Id.* at *2-3.

**{¶ 63}** With respect to the appeal, the union argued that the matter should not be sent to arbitration because the union was pursuing statutory claims for violation of

---

[6] Arbitration was not involved in *Deeds* because the bargaining agreement allowed appeals to be taken to court after the grievance proceeding concluded. *Deeds* at 9.

bargaining rights rather than a contractual violation. However, after reviewing the complaint, the court of appeals disagreed. The court stated that:

> Although the Union's petition contains repeated references to the terms of the CBA and the Master Contract Document, including multiple citations to and quotes from both contracts, the Union insists that the petition asks the trial court to determine the meaning of provisions of Chapter 174 [statutes pertaining to collective bargaining] and to declare a violation of those provisions. We do not agree. The Union seeks a judicial declaration that the City has, without authority, changed health-care benefit eligibility without bargaining collectively. A court cannot make such a declaration without first interpreting the current CBA provisions regarding health-care benefits, and then determining whether the information or action required by the City alters or changes the CBA's current provisions. Therefore, we conclude this claim is within the scope of the arbitration agreement.

*Id.* at *6.

{¶ 64} This is consistent with our reasoning in *Internatl. Assn. of Firefighters, Local 136*, which indicated that arbitration is required even if a contract does not specifically address the issues presented to the arbitrator, because interpretation of the contract is required. *Internatl. Assn. of Firefighters, Local 136*, 2d Dist. Montgomery No. 27600, 2018-Ohio-2746, at ¶ 16.

{¶ 65} In arguing that the trial court erred in refusing to vacate the arbitrator's award, the Board relies heavily on *Stow Firefighters, IAFF Local 1662 v. Stow*, 193 Ohio

App.3d 148, 2011-Ohio-1559, 951 N.E.2d 152 (9th Dist.). In *Stow*, the court of appeals held that an arbitrator's decision that a grievance was arbitrable failed to draw its essence from the collective-bargaining agreement. *Id.* at ¶ 4. *Stow* involved a grievance that claimed, among other things, that the city had violated the bargaining agreement by requiring a firefighter to submit to a fitness-for-duty evaluation. *Id.* at ¶ 2.

**{¶ 66}** The trial court found that the arbitrator did not exceed his authority by addressing the city's order, which had required the firefighter to submit to a fitness-for-duty evaluation. *Id.* at ¶ 4. On appeal, the city contended that the trial court should have vacated the arbitration award. The city asserted that the grievance was not arbitrable because the parties "did not bargain for any limitations on the city's otherwise unrestricted right to evaluate its employees' fitness for duty." *Id.* at ¶ 21.

**{¶ 67}** The arbitrator had found the grievance arbitrable based on the fact that the grievance language challenged management's exercise of rights under the management responsibilities section of the agreement. The court of appeals commented, however, that the arbitrator failed to point to any term or provision in that section which affected the employer's right to conduct fitness-for-duty evaluations. *Id.* at ¶ 30.

**{¶ 68}** The court of appeals then reviewed two sections of the contract that reserved management rights. The first section generally retained all rights conferred by Ohio laws, the Ohio Constitution, and the city's charter. The second, more specific section listed various rights, including the city's right to "direct, supervise, evaluate, or hire and select employees." *Id.* at ¶ 31. The union had also agreed in the contract that " 'all of the functions, rights, powers, responsibilities and authority of the Employer in regard to the operation of its work and business and the direction of its workforce which the

Employer has not specifically abridged, deleted, granted or modified by the express and specific written provisions of this Agreement are, and shall remain, exclusively those of the Employer.' " *Id.*, quoting Section 4.05 of the agreement.

**{¶ 69}** The court of appeals concluded that "[t]he plain language of the agreement seems to indicate that the city has reserved for itself the right to evaluate its employees' fitness for duty." *Id.* at ¶ 31. The court then noted that the union had failed to point to any provision in the agreement modifying the city's reserved right to order employees to submit to such an evaluation. *Id.* at ¶ 32. After making these observations, the court of appeals stated that:

Under R.C. 4117.08(C)(2), a public employer retains the right to "evaluate" employees "[u]nless [it] agrees otherwise in a collective bargaining agreement." In *State ex rel. Bardo v. Lyndhurst* (1988), 37 Ohio St.3d 106, 524 N.E.2d 447, the Ohio Supreme Court explained that R.C. 4117.08(C) removes the itemized reserved powers from the scope of a collective-bargaining agreement "unless the parties affirmatively address that subject in their negotiations." *Id.* at 113, 524 N.E.2d 447, fn. 5. The arbitrator in this case agreed with the parties that this collective-bargaining agreement did not include terms or provisions dealing with fitness-for-duty evaluations. Under *Bardo*, the city's right to evaluate its employees did not become a "term or provision" of the contract, subject to arbitration, simply by being included in the listing of reserved rights in the management-responsibilities provision. Both the plain language of R.C. 4117.08(C) and the Supreme Court's decision in *Bardo* run directly contrary to the union's

position that "[i]f an employer seeks to prohibit management right terms from being subject to arbitration, it must negotiate terms into the labor agreement excluding such from arbitration."

*Id.* at ¶ 33.

{¶ 70} The Board contends that, like the employer in *Stow*, its decision to conduct the dependent audit was not arbitrable because the Board retained management rights under R.C. 4117.08(C)(1) and (3), and no specific provision in the Master Contract modified these reserved rights. However, *Stow* is distinguishable from the case before us.

{¶ 71} Unlike the agreement in *Stow*, where the city retained the right to "evaluate" employees, the Master Contract did not list any specific rights that were reserved, other than those that the Board "heretofore possessed" (Section 67.06), or those "conferred on it under the provisions of the Revised Code of Ohio." (Preamble, Section B). These are very non-specific references.

{¶ 72} Even if we included the inherent management rights mentioned in R.C. 4117.08(C) (which we have previously discussed), the matters listed in R.C 4117.08(C)(1) and (3) are much more general than evaluating employees. For example, R.C. 4117.08(C)(1) refers generally to items like "overall budget," "organizational structure," and use of "technology." The last part of R.C. 4117.08(C) also states that "[t]he employer is not required to bargain on subjects reserved to the management and direction of the governmental unit *except* as affect wages, hours, terms and conditions of employment, and the continuation, modification, or deletion of an existing provision of a collective bargaining agreement." (Emphasis added.) As was previously noted, health care, as

an employee benefit, fits within the categories of items that are included within conditions of employment. In fact, R.C. 4117.03(E) specifically includes the ability to "bargain collectively for health care benefits" within the rights of public school employees.

{¶ 73} Accordingly, we conclude that the arbitration award was rationally derived from the terms of the parties' collective bargaining agreement. Even though the Board claimed to have reserved certain management rights pursuant to statute, health care benefits were a bargainable subject, and whether the Board could impose additional requirements required resort to contract interpretation. The Board's sole assignment of error, therefore, is overruled.

{¶ 74} As a final matter, we decline to consider the DEA's contention that the Board should pay attorney fees under App.R. 23. Courts have refused to consider such requests where the party seeking fees fails to file a motion, but instead simply inserts the matter in its brief. *See Carrollton Exempted Village School Dist. Bd. of Educ. v. Ohio Assn. of Pub. School Emps.*, 7th Dist. Carroll No. 03CA795, 2004-Ohio-1385, ¶ 28. Even if we considered the issue, we would conclude that the appeal is not frivolous, as the Board presented a reasonable question for review. *See, e.g.*, *Moshos v. Moshos*, 2d Dist. Greene No. 03CA83, 2004-Ohio-4932, ¶ 9.

## III. Conclusion

{¶ 75} The Board's sole assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, J., concurring:

**{¶ 76}** I concur in the well-reasoned, comprehensive majority opinion. I write separately to explain my thoughts concerning why the arbitrator's decision, though, in my opinion, flawed, involves a necessary CBA interpretation, with this conclusion leading to the ultimate conclusion that the arbitrator did not exceed his authority.

**{¶ 77}** This determination is difficult because the arbitrator concluded, and, on appeal, the DEA agrees, that the Board's conduction of the dependent verification audit was, under R.C. 4117.08(C) and the CBA, a reserved right. The Board, from this, asserts that the audit's conduction is outside the scope of the CBA's grievance process. This, quite frankly, is a logical, reasonable contractual interpretation, and if the arbitrator had reached this conclusion, any attempt by the DEA to vacate such a determination would have been futile. This is so because the suggested result would have involved an interpretation of the CBA, the parties have agreed to submit contractual interpretation issues to binding arbitration, and the suggested arbitration decision, "whether * * * correct or not," would have been within the arbitrator's authority. *Internatl. Assn. of Firefighters, Local 136*, 2d Dist. Montgomery No. 27600, 2018-Ohio-2746, ¶ 16.

**{¶ 78}** The question, therefore, is whether the arbitrator's actual, contrary determination involved a required interpretation of the CBA. If it did, the arbitrator, irrespective of the merits of the decision, did not exceed his authority and the arbitration award is not subject to vacation under R.C. 2711.10(D).

**{¶ 79}** The first question addressed is whether the arbitrator's decision represents a contractual interpretation as opposed to the arbitrator, out of whole cloth, simply imposing his own "brand of industrial justice." *Ohio Office of Collective Bargaining v. Ohio Civ. Serv. Emps. Assn., Local 11, AFSCME*, 59 Ohio St.3d 177, 180, 572 N.E.2d 71

(1991). A review of the arbitrator's decision indicates that he engaged in an interpretation of the CBA. The arbitration decision states that the Board's management right to conduct the audit "is governed somewhat by Article 49." The arbitrator, from this, concluded that Article 49 acted as a governor on the Board's right to conduct the audit so that the audit could not be conducted in an "arbitrary, capricious, discriminatory, unconscionable, or clearly unreasonable" fashion.

{¶ 80} The arbitrator, in short, interpreted the intersection between the Board's right to conduct the audit and the Article 49 bargained-for health insurance benefits. The arbitrator's interpretation may be strained, with it being particularly distressing that the arbitrator, after finding that the audit's "procedures and requirements [were] not unreasonable on their face[,]" conducted an examination of the individual claims. The arbitrator, nonetheless, did conduct an interpretation of the CBA.

{¶ 81} The next, and final, question is whether the arbitrator's CBA interpretation was required. The Board argues that since the audit was within its reserved rights, no CBA interpretation was necessary. This argument, however, ignores the fact that the DEA's grievance required the arbitrator to determine how, if at all, Article 49 affected the Board's management right to conduct the audit.

{¶ 82} Since the arbitrator, in order to resolve the DEA's grievance, had to interpret the interplay between the Board's right to conduct the audit and the bargained-for health insurance benefits, the arbitrator necessarily engaged in an interpretation of the CBA. Thus, the arbitrator, irrespective of the merits of his decision, did not exceed the authority the CBA granted to him, making vacation of the decision under R.C. 2711.10(D) inappropriate.

HALL, J., dissenting:

{¶ 83} In my opinion, the arbitrator strayed from the bargaining agreement and improperly applied his own general sense of "fairness" to limit a management right that was not subject to arbitration. In doing so, "[t]he arbitrator[ ] exceeded [his] powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." R.C. 2711.10(D). Therefore, I dissent.

{¶ 84} As indicated in the majority opinion "whether an arbitrator has exceeded his authority is a question of law * * *.' " *Portage Cty. Bd. of Dev. Disabilities*, 153 Ohio St.3d 219, 2018-Ohio-1590, 103 N.E.3d 804, at ¶ 25, quoting *Green*, 200 F.3d 967, 974 (6th Cir.2000). Here, the arbitrator determined that the conducting of an audit of eligibility for health care coverage was a management right. The audit began in September 2015. The DEA was an active participant in the audit and throughout the process did not complain that the audit, or the manner of implementation, was not a management right. They did not file their "class action" grievance until February 11, 2016. On its face then, the grievance was not timely. A grievance must be filed within 30 days after the staff member knew or should have known of the event or condition upon which the grievance is based. The DEA knew for months of the specific requirements of the documentation needed for the audit. If the DEA desired to contest the nature and extent of the third-party audit, it should have done so when it became aware of the audit process, rather than actively participating in it. Moreover, the audit emphatically demonstrated that exploitation of the benefits provided by the Board was rampant. "ConSova audited 2,531 enrolled dependents. (Doc. No. 5, Record, Board J-187)  As a result of the audit, DPS dropped

coverage for 571 dependents (i.e. 381 children, 12 domestic partners, and 178 spouses)." Appellant's brief at 8. More than one out of every five enrolled dependents was ineligible.

{¶ 85} With this backdrop, when the arbitrator determined that the audit was a management right, his involvement was concluded. Under the CBA and state statute, reserved management rights are not subject to arbitration, and the arbitrator was without jurisdiction to apply his own sense of reasonableness, because that was no longer supported by any nexus with the contract. The Board reserved exclusive authority to exercise its management rights. "67.06 Management's Rights. All rights and powers heretofore possessed by the BOARD, *except as otherwise specifically modified by the express provisions* of this CONTRACT, shall be retained solely and exclusively by the BOARD." (Emphasis added). Article 67, Section 67.06, Board Ex. H-143. Management rights are also specifically preserved to management by R.C. 4117.08. In my opinion, the only logical conclusion is that, once the arbitrator determined that the audit was a management right, the inquiry was over and not subject to arbitration.

{¶ 86} The arbitrator's errant wandering is evident from his opinion and award. The arbitrator concluded that "management was within its broad management authority to verify the existing status of claimed dependents (and spouses) by initiating an audit. * * * The audit procedures and requirements are not unreasonable on their face. Sufficient time was provided for compliance with the required submissions. It was not unreasonable for ConSova to request the specific documents it wanted to use for verification." Board Ex. M-14. The arbitrator then went on to opine, without reference to any citation, precedent or standard, that he should determine "whether it was reasonable to require only the specified documents on an exclusive basis for verification when the failure to

meet the specifications resulted in total loss of medical insurance coverage." *Id.* Not only was this diametrically opposed to the arbitrator's prior conclusion, but if an unfettered sense of "reasonableness" applied, then none of the 571 ineligible dependents should have had their insurance denied, because that was too harsh a penalty. That's absurd, unsupported by reason or logic, and not drawn from the contract. In my opinion, the arbitrator's conclusion was created out of whole cloth. It amounts to no more than second-guessing preserved management rights and, if affirmed, results in no management rights at all.

**{¶ 87}** I would conclude that the arbitrator exceeded his powers and imperfectly executed those powers by allowing an untimely grievance and by applying his own general sense of "fairness" to the grievants who did not comply with the objectively generous terms of the audit. I would vacate the award, and therefore dissent.

Copies mailed to:

Brian L. Wildermuth
Lauren K. Epperley
Susan D. Jansen
Hon. Richard Skelton