[Cite as *Greater Dayton Regional Transit Auth. v. Amalgamated Transit Union AFL-CIO Local 1385*, 2019-Ohio-392.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| GREATER DAYTON REGIONAL TRANSIT AUTHORITY | : | |
| | : | |
| | : | Appellate Case No. 28155 |
| Plaintiff-Appellant | : | |
| | : | Trial Court Case No. 2018-CV-3250 |
| v. | : | |
| | : | (Civil Appeal from |
| AMALGAMATED TRANSIT UNION AFL-CIO LOCAL 1385 | : | Common Pleas Court) |
| | : | |
| Defendant-Appellee | : | |

. . . . . . . . . .

# O P I N I O N

Rendered on the 8th day of February, 2019.

. . . . . . . . . .

RONALD G. LINVILLE, Atty. Reg. No. 0025803, MATTHEW L. ROBERTS, Atty. Reg. No. 0079938 and RYAN A. CATES, Atty. Reg. No. 0085496, 200 Civic Center Drive, Suite 1200, Columbus, Ohio 43215
      Attorneys for Plaintiff-Appellant

JOSEPH S. PASS, Atty. Reg. No. 0093158, 219 Fort Pitt Boulevard, Pittsburgh, Pennsylvania, 15222
      Attorney for Defendant-Appellee

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} In this case, the Greater Dayton Regional Transit Authority ("RTA") appeals from a judgment confirming an arbitration award in favor of Amalgamated Transit Union, AFL-CIO Local 1385 ("Union"). According to RTA, the trial court erred in confirming the award because the award destroys management rights guaranteed to RTA by the Ohio Revised Code and by the parties' collective bargaining agreement ("CBA"). RTA further contends that the award conflicts with the CBA's express terms, which give RTA management rights over assigning job duties.

{¶ 2} We conclude that the trial court did not err in confirming the arbitration award in favor of the Union. The award drew its essence from the CBA because it did not conflict with the agreement's express terms and was rationally supported by the agreement. The parties agreed to assign a specific task to a particular job classification, and there was also a past practice of having only employees in that job classification perform the task. This past practice was unequivocal, was clearly enunciated, and was followed for a reasonable period of time as a fixed and established practice accepted by both parties. It, therefore, was binding on the parties. Even if the past practice had not been binding, the CBA specifically required past practices or precedent to be considered in interpreting the agreement. Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 3} In July 2018, RTA filed a motion asking the trial court to vacate an arbitration award that was issued in April 2018. The award arose from a dispute between RTA and

the Union over whether RTA could require paratransit operators to fuel their vehicles offsite rather than having this task performed by individuals employed in a "cleaner/fueler" position.

{¶ 4} RTA is a regional transit authority that provides transportation for passengers using route buses. RTA also transports disabled passengers using Project Mobility (PMOB) operators. Before 1995, RTA used seven diesel vehicles for PMOB, and the rest of the transportation was done by Liberty Cab. In 1995, however, PMOB became in-house in its entirety. Chrysler minivans were obtained in 1995, and the operators fueled these gasoline vehicles themselves offsite because no fuel pump was available on site. After a grievance was filed, alleging that fueling was not the work of PMOB operators, but was the work of fuelers, the parties agreed that fuelers would fuel the PMOB vehicles. Thereafter, PMOB operators did not fuel their own vehicles.

{¶ 5} Subsequently, RTA replaced the minivans with 2008 and 2009 TESCO diesel vehicles, which essentially consisted of a Ford E450 chassis with a box on back for passengers. These vehicles used diesel fuel and were about 24 feet long, with a wheelchair lift for passengers.

{¶ 6} RTA uses two buildings located on Longworth Street in Dayton, Ohio, to house and service its vehicles. The route buses, which use diesel fuel, are housed in 600 Longworth ("600 building"), which has fueler lanes. This location also has two gasoline tanks, each of which has a capacity of about 2,000 gallons. However, because the tanks are not connected, each can be filled only to 85% of capacity, or to about 1,700 gallons.

{¶ 7} The PMOB vehicles are housed across the street at 601 Longworth ("601

building"), which contains two 20,000 gallon tanks filled with diesel fuel. These tanks were used to fuel the PMOB diesel vehicles, but also serve as a backup for the route buses in case of issues with the diesel tanks at the 600 building.

{¶ 8} The TESCO vehicles were designated as about seven-year vehicles. When RTA began preparing for their replacement, it could not find a manufacturer who used diesel engines in the chassis size needed for para-transit operations. As a result, RTA ordered a gasoline vehicle called an Eldorado, which used a Ford E50 chassis, was about 30 feet long, and carried 15 passengers. The Eldorado was about the same size as the prior vehicle.

{¶ 9} RTA purchased the Eldorados in early 2016, and received 30 new vehicles in the fourth quarter of 2016. The first vehicles were placed in service in January 2017. When RTA purchased these vehicles, it knew a fueling plan would have to be devised because the vehicles did not use diesel fuel. RTA investigated various options, including having someone come on-site and fuel the vehicles, but RTA could not find a vendor willing to do that for gasoline. RTA also investigated building a gasoline tank, but that involved a one- to two-year process. There were also environmental concerns because the 601 building was close to a river.

{¶ 10} RTA began fueling the vehicles on-site at the two gasoline pumps at the 600 building. At that point, RTA thought it could succeed with the first 30 vehicles until a contract could be put in place for off-site fueling. These pumps were located outside, with no cover.

{¶ 11} The prior fueling process with a diesel vehicle at the 601 building, including running the vehicle through the hot washer, took four to five minutes. Notably, this

location had high pressure diesel pumps and nozzles that could fuel vehicles very quickly. In contrast, the new process took about 15 to 20 minutes. Time was added by having to drive the Eldorado down the street, and because the 600 building used siphon pumps on its gasoline pumps. The pumps, thus, had low pressure, and it took longer to fill vehicles.

{¶ 12} Based on the 75 PMOB vehicles that would be in use, RTA concluded that it would not be possible to fuel at the 601 building. Ultimately, RTA decided to use an outside vendor and have PMOB operators pump the gas. RTA arranged with Speedway to allow operators to fuel the vehicles at any Speedyway station in Ohio, and placed fuel cards in the vehicles. The procedure at the pump was to be done at the end of the employee's run and involved the same process any motorist would use, other than the fact that the operator was required to put in the vehicle's mileage and an employee identification number.

{¶ 13} About 30 Eldorados went into use in early 2017 and RTA expected to begin using another 28 vehicles in March 2017. On February 21, 2017, RTA and the Union discussed the PMOB buses, fuel, and a memorandum of understanding ("MOA"). After this meeting, Robert Stevens, RTA's manager of labor relations, sent a MOA to Glenn Salyer, the Union President. Stevens had been employed at RTA since 1991 and had been on the Union's executive board from 1992 until 2016, when he took the labor relations position. Stevens had negotiated every contract on behalf of the Union from 1992 until 2010.

{¶ 14} Salyer had been employed by RTA for about nine years, had been the Union president for the past five and a half years, and was part of the negotiating team for the current labor agreement, which was effective from April 1, 2016 through March 31,

2019.

{¶ 15} The MOA, dated February 22, 2017, was addressed to Salyer and stated as follows:

On February 21, 2017, the Authority met with ATU officials including you and discussed revised fueling procedures that will include Para-Transit Operators fueling their vehicles prior to returning to the garage. During the 1995-1996 time frame ATU Para-Transit Operators fueled minivans offsite. The purpose of this change comes from the recent and future purchases of new Para-Transit vehicles. We have received 30 new vehicles in 4th quarter 2016 and [are] currently receiving 28 additional vehicles by March 2017. We will receive the remaining 17 vehicles in the summer of 2017 for a total of 75.

The old fleet requires diesel fuel and are fueled at our Longworth facilities. Currently the market is moving away from engines using diesel to unleaded fuels. The new fleet requires unleaded fuel and each vehicle can hold up to 55 gallons. We do not have the storage capacity at the 600 Longworth facility for unleaded fuel to accommodate the additional service requirement. RTA will contract with a local fuel supplier to provide resources at multiple locations for the ability to fuel our vehicles throughout the day.

The Operations Department Para-Transit Operators will fuel vehicles at a designated location prior to returning to the garage. The fueling of the vehicle will be incorporated into their workday. The Maintenance

Department will check fluids, clean, empty fareboxes and maintain the bus consistent to the current practice except for fueling.

Union Ex. 1, p. 1.

{¶ 16} Stevens sent the agreement to Salyer by email on February 25, 2017; Stevens had already signed the document. Salyer responded that the Union did not agree with the MOU. At that point, Stevens reminded Salyer of his prior comment that the MOU appeared to be workable, but was a change in working compensation for the operators who would have to do the fueling.[1] Further correspondence from the Union asserted that this was also a change in working conditions. *See* Union Ex. 4. RTA offered additional incentives, but no agreement was reached. As a result, on March 28, 2017, Stevens informed the Union that RTA would award a contract for fueling the gasoline vehicles off premises, that PMOB operators would be fueling their vehicles, and that Union maintenance employees (the cleaners/fuelers) would still perform all their current duties, other than fueling these vehicles. Union Ex. 3.

{¶ 17} On April 4, 2017, the Union filed a grievance alleging that RTA had violated the following provisions of the CBA: Article I, Section 4(I); Article VI, Sections 1 (A), (B), and (C); Article XIX, Sections 1-11; and Article XXVI, Section 4. After the grievance was denied on all levels, the matter was referred to an arbitrator, whose decision was "final and binding upon both parties" pursuant to Article XXXI, Section 9 of the CBA. Joint Ex. 1, p. 38.

{¶ 18} The arbitrator held a hearing in December 2017 and heard testimony from

_____

[1] At the time of the arbitration hearing, a cleaner/fueler was paid $25.33 per hour, while the top pay for PMOB operators was $15.29 per hour. Thus, a disparity in pay rates existed, and PMOB operators were paid only their regular rate while fueling their vehicles.

Salyer and Stevens, as well as the following individuals: Robert Baker, a former RTA employee and Union member from 1995 to 2008; Daron Brown, RTA Director of Maintenance; and Pat O'Malley, who had been employed by RTA for more than 25 years and was the current Maintenance Fleet Manager. Following the hearing, the arbitrator issued a decision concluding that RTA had violated the CBA by requiring PMOB operators to fuel, and, therefore, to perform duties of the cleaners/fuelers. The arbitrator ordered RTA to cease and desist from requiring operators to perform fueling duties (which had begun in September 2017). In addition, the arbitrator ordered RTA to retroactively compensate PMOB operators who had performed such work at the rate the CBA established for a cleaner/fueler.

{¶ 19} RTA then filed a motion asking the trial court to vacate the arbitration decision. The Union followed with an application for an order confirming the arbitration award. Subsequently, the trial court filed a decision and entry overruling RTA's motion and granting the application to confirm the award. This appeal by RTA followed.

## II. Alleged Error in Overruling the Motion to Vacate the Arbitration Award and in Granting the Application to Confirm the Award.

{¶ 20} In support of its appeal, RTA has filed two assignments of error. Because they are intertwined, we will address them together. The assignments of error, in order, are as follows:

The Montgomery County Court of Common Pleas Erred in Its Decision and Entry Overruling Plaintiff's Motion to Vacate Arbitration Award Dated September 12, 2018, by Overruling Plaintiff/Appellant Greater

Dayton Regional Transit Authority's Motion to Vacate Arbitration Award Dated July 13, 2018 (September 12, 2018 Decision and Entry).

The Montgomery County Court of Common Pleas Erred in Its Decision and Entry Overruling Plaintiff's Motion to Vacate Arbitration Award dated September 12, 2018, by Confirming Defendant/Appellee Amalgamated Transit Union Local 1385's Application for Order Confirming Award Dated September 12, 2018 (September 12, 2018 Decision and Entry).

**{¶ 21}** RTA does not make specific arguments relating to these assignments of error, but focuses instead on ways in which the arbitrator's award departed from the essence of the CBA by conflicting with its express terms and by failing to be rationally derived from the CBA. In this regard, RTA makes the following contentions: the arbitrator's award eviscerates management rights that the CBA and Ohio Revised Code guarantee to RTA; the award conflicts with RTA's right to assign job duties to its employees; there is no rational basis for the award because it imposes new restrictions for which the parties did not contract; and the arbitrator reached an absurd conclusion by holding that RTA agreed to give up its management right to assign the task of fueling. Before we address these arguments, we will outline the relevant standards for evaluating arbitration awards.

**{¶ 22}** Under R.C. 2711.13, any party may file a motion in the common pleas court to vacate awards that have been made in arbitration proceedings. In addition, R.C. 2711.09 also permits parties to file motions in the common pleas court for orders confirming arbitration awards. In either situation, a common pleas court must grant the

order to confirm unless the court vacates, modifies, or corrects the award under R.C. 2711.10 or R.C. 2711.11.

{¶ 23} The applicable provision here is R.C. 2711.10, which states, in pertinent part, that:

In any of the following cases, the court of common pleas shall make an order vacating the award upon the application of any party to the arbitration if:

* * *

(D) The arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

{¶ 24} The Supreme Court of Ohio has rejected an abuse of discretion standard for reviewing arbitration awards and has held that:

When reviewing a decision of a common pleas court confirming, modifying, vacating, or correcting an arbitration award, an appellate court should accept findings of fact that are not clearly erroneous but decide questions of law de novo.

*Portage Cty. Bd. of Dev. Disabilities v. Portage Cty. Educators' Assn. for Dev. Disabilities*, 153 Ohio St.3d 219, 2018-Ohio-1590, 103 N.E.3d 804, syllabus.

{¶ 25} Because public policy favors arbitration, we have "only limited authority to vacate an arbitrator's award."  *Assn. of Cleveland Fire Fighters, Local 93 of the Internatl. Assn. of Fire Fighters v. Cleveland*, 99 Ohio St.3d 476, 2003-Ohio-4278, 793 N.E.2d 484, ¶ 13.   Thus, we are restricted to deciding if "the award draws its essence from the CBA

and whether the award is unlawful, arbitrary, or capricious." *Id.*, citing *Findlay City School Dist. Bd. of Edn. v. Findlay Edn. Assn.*, 49 Ohio St.3d 129, 551 N.E.2d 186 (1990), paragraph two of the syllabus. Consequently, if a rational nexus exists between the contract and the award, and "the award is not arbitrary, capricious or unlawful, the arbitrator did not exceed her authority and the award cannot be vacated pursuant to R.C. 2711.10(D)." *Montgomery Cty. Sheriff v. Fraternal Order of Police*, 158 Ohio App.3d 484, 2004-Ohio-4931, 817 N.E.2d 107, ¶ 22 (2d Dist.).

{¶ 26} "An arbitrator's award departs from the essence of a collective bargaining agreement when: (1) the award conflicts with the express terms of the agreement, and/or (2) the award is without rational support or cannot be rationally derived from the terms of the agreement." *Ohio Office of Collective Bargaining v. Ohio Civ. Serv. Emps. Assn., Local 11, AFSCME, AFL-CIO,* 59 Ohio St.3d 177, 572 N.E.2d 71 (1991), syllabus. *Accord Dayton City School Dist. Bd. of Edn. v. Dayton Edn. Assn.*, 2d Dist. Montgomery No. 27793, 2018-Ohio-4350, ¶ 40. In addition, arbitrators may not create their own contracts "by imposing additional requirements not expressly provided for in the agreement." *Internatl. Assn. of Firefighters, Local 67 v. Columbus*, 95 Ohio St.3d 101, 104, 766 N.E.2d 139 (2002), citing *Ohio Office of Collective Bargaining* at 183.

{¶ 27} Because the issue of whether an arbitrator exceeds his or her authority is a question of law, we review this point de novo, without deferring to the trial court's decision. *Dayton City School Dist. Bd. of Edn.* at ¶ 42, citing *Portage Cty. Bd. of Dev. Disabilities*, 153 Ohio St.3d 219, 2018-Ohio-1590, 103 N.E.3d 804, at ¶ 25. With these standards in mind, we will consider RTA's arguments.

A. Management Rights Granted by the Revised Code

**{¶ 28}** During the hearing, the Union stated its grievance as follows:

Whether the RTA violated the parties' Collective Bargaining Agreement requiring operators to fuel coaches and not paying the fueler rate; and if so, what shall the remedy be.

December 12, 2017 Arbitration Transcript ("Tr."), p. 6.

**{¶ 29}** RTA's description of the issue was similar, by asking whether the Union proved that RTA violated any specific provision of the CBA by assigning fueling of PMOB vehicles to para-transit operators. Arbitrator's Opinion and Award, p. 7. The arbitrator elected to use the Union's statement. *Id.*

**{¶ 30}** As RTA suggests, R.C. 4117.08, which is part of Ohio law on public employee collective bargaining, does provide protection for certain management rights. However, there are qualifications. In this regard, R.C. 4117.08(A) provides that:

All matters pertaining to wages, hours, or terms and other conditions of employment and the continuation, modification, or deletion of an existing provision of a collective bargaining agreement are subject to collective bargaining between the public employer and the exclusive representative, except as otherwise specified in this section * * *.

**{¶ 31}** R.C. 4117.08(C) also states, in pertinent part, that:

Unless a public employer agrees otherwise in a collective bargaining agreement, nothing in Chapter 4117 of the Revised Code impairs the right and responsibility of each public employer to:

* * *

(2) Direct, supervise, evaluate, or hire employees;

(3) Maintain and improve the efficiency and effectiveness of governmental operations;

(4) Determine the overall methods, process, means, or personnel by which governmental operations are to be conducted;

(5) Suspend, discipline, demote, or discharge for just cause, or lay off, transfer, assign, schedule, promote, or retain employees;

* * *

(8) Effectively manage the work force * * *.

{¶ 32} Finally, R.C. 4117.08(C) also states that:

The employer is not required to bargain on subjects reserved to the management and direction of the governmental unit *except* as affect wages, hours, terms and conditions of employment, and the continuation, modification, or deletion of an existing provision of a collective bargaining agreement. A public employee or exclusive representative may raise a legitimate complaint or file a grievance based on the collective bargaining agreement.

(Emphasis added).

{¶ 33} The statutory framework, thus, is as follows: (1) subsection (A) sets out the matters that are subject to collective bargaining; (2) subsection (C) outlines management rights that are not impaired by statutes pertaining to public employees' collective bargaining, unless the employer agrees otherwise; and (3) the last paragraph of subsection (C) qualifies the rest of that subsection, "i.e., the exemption from bargaining

does not extend to subjects that 'affect wages, hours, terms and conditions of employment, and the continuation, modification, or deletion of an existing provision of a collective bargaining agreement.' " *Dayton City School Dist. Bd. of Edn.*, 2d Dist. Montgomery No. 27793, 2018-Ohio-4350, ¶ 55.

{¶ 34} In *Lorain City School Dist. Bd. of Educ. v. State Emp. Relations Bd.*, 40 Ohio St.3d 257, 262, 533 N.E.2d 264 (1988), the Supreme Court of Ohio concluded that:

The word "affect" in R.C. 4117.08(C) suggests that management rights which "act upon" or "produce a material influence upon" working conditions are bargainable. *See* Webster's Third New International Dictionary (1986) 35. Thus, a reasonable interpretation of R.C. 4117.08(C) is that where the exercise of a management right causes a change in or "affects" working conditions or terms of a contract, then the decision to exercise that right is a mandatory subject for bargaining.

{¶ 35} Consistent with R.C. 4117.08(C), Article I, Section 4(A) through (I) of the CBA incorporate the statutory reservation of management rights. *See* Joint Ex. 1, p. 1. Thus, as RTA indicates, it retained the right to exercise certain management rights, unless a specific provision in the agreement provided otherwise. The arbitrator recognized this, but also noted that under Article I, Section 4(I), RTA was "obligated to bargain over matters that . . . 'affect wages, hours, terms and conditions of employment, and the continuation, modification, or deletion of an existing provision of the Agreement.' " Arbitrator's Opinion and Award at p. 15, quoting Joint Ex. 1 at p. 2. This provision of the CBA echoes R.C. 4117.08(C), which, as noted, provides exceptions to the exemption from bargaining.

{¶ 36} After making the above observation, the arbitrator noted that Article XXVI, Section 4 of the CBA designated fueling as the job function of a cleaner/fueler, and concluded that this could not be changed without the Union's consent. *Id.* The Arbitrator further rejected RTA's argument that including the words "as the situation dictates" allowed it to assign the fueling task to the PMOB operators. In this regard, the Arbitrator reasoned that the cleaner/fueler provision appeared in maintenance titles, which were separate and apart from parts of the agreement pertaining to RTA operations (where the provisions pertaining to PMOB operators appeared). The arbitrator further reasoned that the bargaining history of the parties indicated that fueling had traditionally been considered maintenance work, and that the parties did not bargain to include fueling as part of the PMOB operators' duties.

{¶ 37} After reviewing the agreement and the record, we cannot conclude that the arbitrator's award eviscerates RTA's statutory or contractual rights. To the contrary, the arbitrator recognized these rights, but concluded that under the terms of the contract, the RTA was required to bargain over a change in duties. Furthermore, the arbitrator's decision does not conflict with the terms of the contract giving RTA the right to assign job duties to its employees.

{¶ 38} As was noted, even though a party retains management rights, "where the exercise of a management right causes a change in or 'affects' working conditions or terms of a contract, then the decision to exercise that right is a mandatory subject for bargaining." *Lorain City School Dist. Bd. of Educ.*, 40 Ohio St.3d at 262, 533 N.E.2d 264.

{¶ 39} There is no question that removing a job duty specifically assigned to

cleaners/fuelers affected a term of the contract. Article XXVI, Section 4, specifically states that:

> A cleaner/fueler classification will be created within the utility cleaner classification. The job function of this classification will be fueling, servicing and cleaning coaches as the situation dictates. The rate of pay will be equal to that of a number three (#3) Service and Repair Mechanic.

Joint Ex. 1 at p. 31.

**{¶ 40}** As the arbitrator noted, the CBA does distinguish between maintenance and operations, and the provisions pertaining to PMOB operators are found in a different part of the CBA (Article IV(A)). Joint Ex. 1 at p. 7. Article IV(A), Section 1(A) also states that "all sections of this Labor Agreement applicable to *operators* will apply to Project Mobility (PMOB) Operators * * *." (Emphasis added.) *Id.* Referring to the CBA, the agreement clearly does contain various sections that distinguish between maintenance employees and operators. *See, e.g.*, Article VII (outlining holidays for operators versus those for maintenance employees); Articles XVIII through XXII (describing seniority and working conditions for operators); and Articles XXVI through XXVIII (outlining seniority and working conditions for maintenance personnel).

**{¶ 41}** Furthermore, the arbitrator correctly looked to the parties' historical and traditional practice in interpreting the contract. In fact, Article XXX (Governing Interpretations), states in Section 1 that:

> The interpretations or the wording or terms of this Agreement shall be by the application of definitions where they are set forth in this Agreement, *by established past precedents and past practices* or in light of

the intent and purposes to be accomplished.

(Emphasis added.)   Joint Ex. 1 at p.35.

{¶ 42} In *Assn. of Cleveland Fire Fighters*, 99 Ohio St.3d 476, 2003-Ohio-4278, 793 N.E.2d 484, at ¶ 9, the Supreme Court of Ohio considered whether a practice known as "arrowing" violated the express terms of a collective bargaining agreement.   The court held that this practice, which involved the city's temporary day-to-day changing of shifts, did violate the agreement, because only yearly shift changes were authorized by the CBA. *Id*. at ¶ 14.   The arbitrator had also held that arrowing was a binding past practice, but the court disagreed with this, commenting that "arrowing cannot be interpreted as a binding past practice because of the union's continuing vehement fight against its use." *Id*. at ¶ 15.   The court went on to adopt a new test, noting that:

> Other states have contemplated the factors required for a past practice to be binding.   The predominant definition, and the one used by both the arbitrator and the union, requires that to be binding on parties to a collective bargaining agreement, a past practice must be (1) unequivocal, (2) clearly enunciated, and (3) followed for a reasonable period of time as a fixed and established practice accepted by both parties. *Celanese Corp. of Am.* (1954), 24 Labor Arb. Reports 168, 172.   We think this a sound and logical test, and hereby adopt it.

(Footnote omitted.)   *Id.* at ¶ 16.

{¶ 43} According to the evidence, RTA and the Union did grieve this specific fueling issue in 1996, and they agreed in a settlement that only a cleaner/fueler would fuel, not the project mobility operators.   RTA and the Union then conducted business this

way from 1996 (and through several contracts) until September 2017, when RTA unilaterally decided to have the project mobility operators also fuel. Under the test that the Supreme Court of Ohio adopted, this practice was unequivocal, was clearly enunciated, and was followed for a reasonable period of time as a fixed and established practice accepted by RTA and the Union. The practice, therefore, was binding on the parties and was properly considered by the arbitrator.

{¶ 44} Even if the past practice were not deemed "binding," the CBA specifically required past practices or precedent to be considered in interpreting the agreement. Furthermore, the CBA was in effect from April 2016 through March 2019. In early 2016, however, RTA knew that it would use gasoline buses and would need some other fueling method because its on-site facilities limited gasoline capacity. Despite these facts, RTA did not raise the subject during negotiations (which lasted 20 months). Instead, RTA waited until February 21, 2017 (after 30 buses had been placed into service) to discuss the issue with the Union. Then, after failing to reach agreement, RTA unilaterally decided to change the job duties of the fueler/cleaner position and to require operators to perform the fueling job.

{¶ 45} The trial court discussed the fact that the CBA did not extend the cleaner/fueler duties to other positions and that forcing PMOB operators to perform cleaner/fueler duties at a lower rate violated the CBA. The court then held that the award drew its essence from the CBA as "the Arbitrator relied directly on its provisions in formulating her decision." Doc. #15, p. 8. The court, therefore, found that the award did not conflict with the CBA and rationally flowed from the terms in the CBA. *Id.* For the reasons discussed above, we agree with the trial court. Accordingly, the arbitrator did

not violate the express terms of the contract which gave RTA the right to assign job duties to employees.

### B. Lack of Rational Basis for the Award

**{¶ 46}** RTA also argues that the award has no rational basis because it imposes new conditions for which the parties did not contract. As support for this contention, RTA repeats the argument, already rejected, that it had an express right under the contract to assign employees and no other provision restricted this right. For the reasons previously discussed, we disagree.

**{¶ 47}** RTA also contends that Article XXVI, Section 4, clearly indicates that there would be instances when the cleaner/fueler would not fuel the buses. In this regard, RTA relies on the statement that the job function of the cleaner/fueler "will be servicing and cleaning coaches *as the situation dictates.*" (Emphasis added.) Joint Ex. 1 at p. 31. Both the arbitrator and trial court rejected this argument, after noting that the statement only pertains to the particular job classification and does not appear elsewhere in the CBA, including the management rights section. *See* Doc. #13 at p. 9; Arbitrator's Opinion and Award at p. 16. In addition, the arbitrator noted that "the parties never bargained to include fueling as part of the PMO[B] duties." *Id.*

**{¶ 48}** We agree with the trial court and arbitrator. In addition, to the extent that the term "as the situation dictates" could be considered ambiguous, any ambiguity in a collective bargaining agreement "cannot be resolved against any one particular party, which further makes the arbitrator's interpretation of the contract provision worthy of deference by a reviewing court * * *." *Cleveland Police Patrolmen's Assn. v. Cleveland*,

99 Ohio App.3d 63, 66-67, 649 N.E.2d 1291 (8th Dist.1994). *See also Dayton v. Fraternal Order of Police*, 76 Ohio App.3d 591, 598, 602 N.E.2d 743 (2d Dist.1991) ("[i]n determining the mutual intent of the parties concerning any ambiguity the arbitrator may look to the entire agreement, the history of the dealings between the parties, and industry practice").

{¶ 49} As was noted, the history of the parties' dealings indicates that the fueling function was limited to the fueler/cleaner position, and PMOB operators did not engage in fueling between 1996 and 2017. Furthermore, the testimony from RTA witness Robert Stevens was that the language "as the situation dictates" was negotiated when Article XXVI, Section 4 (the cleaner/fueler classification) was added to the CBA for the 2006-2009 contract. According to Stevens, this language was included because more than two fuelers/cleaners were needed, and RTA did not want to be held to a situation where fuelers had to act as fuelers all the time. Instead, RTA wanted fuelers to also perform cleaning, because RTA needed cleaners seven days a week. Arbitration Tr. at pp. 157-159.

{¶ 50} "An arbitrator's award draws its essence from a collective bargaining agreement when there is a rational nexus between the agreement and the award." *Mahoning Cty. Bd. of Mental Retardation & Developmental Disabilities v. Mahoning Cty. TMR Educ. Assn.*, 22 Ohio St.3d 80, 488 N.E.2d 872 (1986), syllabus. Another way of saying this is that "an arbitrator departs from the essence of a collective bargaining agreement when * * * 'an award is without rational support or cannot be rationally derived from the terms of the agreement.' " *Ohio Office of Collective Bargaining*, 59 Ohio St.3d at 183, 572 N.E.2d 71, quoting *Cement Divisions, Nat. Gypsum Co. (Huron) v. United*

*Steelworkers of Am.*, *AFL-CIO-CLC, Local 135*, 793 F.2d 759, 766 (6th Cir.1986), *overruled on other grounds*, *Michigan Family Resources, Inc. v. Serv. Emps. Intern. Union Local 517M*, 475 F.3d 746 (6th Cir.2007). This is a difficult standard to meet, and RTA failed to establish that the award lacked any rational support.

{¶ 51} As a further matter, RTA argues that Ohio courts routinely vacate awards where an arbitrator inserts new restrictions to which the parties did not agree. However, no such restriction was inserted. Consequently, we cannot conclude that the arbitrator's decision lacked rational support or could not rationally be derived from the terms of the CBA.

{¶ 52} We note the well-established rule that "[a]n arbitrator's improper determination of the facts or misinterpretation of the contract does not provide a basis for reversal of an award by a reviewing court, because '[i]t is not enough * * * to show that the [arbitrator] committed an error – or even a serious error.' " *Cedar Fair, L.P. v. Falfas*, 140 Ohio St.3d 447, 2014-Ohio-3943, 19 N.E.3d 893, ¶ 6, quoting *Stolt-Nielsen, S.A. v. AnimalFeeds Internatl. Corp.*, 559 U.S. 662, 671, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010). Arbitrators also have " 'broad authority to fashion a remedy, even if the remedy contemplated is not explicitly mentioned' in the applicable contract." *Id.*, quoting *Queen City Lodge No. 69, Fraternal Order of Police, Hamilton Cty., Ohio, Inc. v. Cincinnati*, 63 Ohio St.3d 403, 407, 588 N.E.2d 802 (1992).

### C. Alleged Absurdity of the Award

{¶ 53} Finally, RTA focuses on the alleged absurdity of the arbitrator's finding that RTA agreed to give up its management right to assign the task of fueling. As examples,

RTA contends that it would be seriously hampered if it could not require transit operators to stop at a gas station if their vehicles were running out of gas, require employees to keep the interior of their buses clean and free of tripping hazards, or require employees to keep their windshields clear of bugs.

{¶ 54} This case is not about bugs or tripping hazards; it involves fueling of vehicles. The CBA also does not assign those other tasks to any specific job classification. Furthermore, RTA did not provide any information about how many daily miles any vehicles travel, nor did it provide evidence that any vehicle had ever run out of gas. The only evidence was that PMOB vehicles carry up to 50-55 gallons of fuel and RTA's policy is that the vehicles are fueled every morning, no matter where a vehicle has to go or whether it has a full tank of fuel. Arbitration Tr. at pp. 26, 135-136; Union Ex. 1. The arbitrator and trial court were not required to speculate about evidence that was not presented; likewise, they did not have to consider irrelevant matters.

{¶ 55} More importantly, the parties operated in a certain manner for many years, with fueling duties being confined only to maintenance personnel. This duty was specifically assigned by the CBA to cleaners/fuelers, and there was no evidence that the parties intended otherwise. Accordingly, the arbitrator's award and the decision affirming the award were not absurd.

{¶ 56} Based on the preceding discussion, the First and Second Assignments of Error are overruled.

III. Conclusion

{¶ 57} All of RTA's assignments of error having been overruled, the judgment of

the trial court is affirmed.

. . . . . . . . . . . . .

HALL, J. and TUCKER, J., concur.

Copies sent to:

Ronald G. Linville
Matthew L. Roberts
Ryan A. Cates
Joseph S. Pass
Hon. Gregory F. Singer